**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carlos Lorenzo CORK, Defendant–
Appellant.**

No. 00–5099.

United States Court of Appeals,
Sixth Circuit.

Sept. 6, 2001.

Before KEITH, SILER, and CLAY, Circuit Judges.

## OPINION

PER CURIAM.

Carlos Lorenzo Cork appeals his jury conviction for bank robbery and use of a firearm during and in relation to a crime of violence. Cork challenges the sufficiency of the evidence to support his conviction and the district court's denial of his motion to suppress evidence recovered from his aunt's residence. Because we find no reversible error, we **AFFIRM**.

## I. BACKGROUND

*A. Factual History*

On May 29, 1998, two individuals robbed the Union Planters Bank located in Dyersburg, Tennessee. As branch manager Patty Mallard approached the back door to the bank that morning, an individual wearing a mask and brandishing a gun confronted her. Two robbers followed her into the bank and ordered the tellers to lie down on the floor. The robbers emptied the tellers' cash drawers and the vault, and stole approximately $212,000.00. The robbers taped the tellers' hands and, as they departed, took the keys to a teller's car.

Shortly after the robbery, the Federal Bureau of Investigation ("F.B.I.") and the Dyersburg Police Department conducted an investigation. F.B.I. Agent John Lewoczko went to the bank, conducted a crime scene search, and collected pieces of the duct tape used on the tellers. An hour after the bank robbery, the Dyersburg Police Department located the car that the robbers had stolen from one of the tellers. The police found several pieces of clothing on the ground around the vehicle.

On June 3, 1998, Investigator James Joyner of the Dyersburg Police Department received a tip from a confidential informant who stated that he, Cork, Dwayne Armstrong, and others planned the bank robbery while at Armstrong's apartment. The informant provided specific details about the robbery and indicated that the robbers had planned to leave a portion of the stolen money and other materials at Armstrong's apartment. As to Cork, the informant told Investigator Joyner that Cork had planned to go to Paducah, Kentucky, after the robbery, and that he was very light skinned and could be misidentified as a white male. Investigator Joyner informed Agent Lewoczko of the tip and, based on this information and other evidence, Agent Lewoczko obtained a search warrant for Armstrong's apartment in Dyersburg, Tennessee.

On June 5, 1998, Agent Lewoczko and other agents executed the search warrant at Armstrong's apartment. They found a piece of particle board which appeared to have a diagram of the inside of a bank drawn on the back. They also recovered a partial roll of duct tape, thirty-eight caliber cartridges, nine millimeter cartridges, and two one-thousand dollar money wrappers from the Union Planters Bank. Agent Lewoczko also found a notebook in the apartment that contained papers belonging to Cork.

After the search, the police located Armstrong in the Dyersburg Jail, where he had been incarcerated since May 18, 1998. Consequently, the police eliminated him as a suspect and, based on the notebook and the informant's tip, began looking for Cork and another individual.

On June 9, 1998, Captain Sandy Joslyn of the Paducah, Kentucky, Police Department received a call from an investigator in the Dyersburg Police Department who stated that he believed that Cork was staying with his aunt, Pamela Southward, at her Paducah residence. After Captain Jo-

syln informed Paducah Police Chief Ozean Dodd of the call, Chief Dodd went to Paducah City Hall, where he knew Southward worked, to obtain her consent to enter her home and search for Cork. Southward confirmed that Cork was staying at her home and agreed to accompany Chief Dodd and other Paducah police officers during the search. Southward informed the officers that her sixteen year old son Jerry lived with her as well. When they arrived, Southward's daughter told the officers that Cork and Jerry had taken a car to the repair shop and that she expected them to return after lunch. After asking Southward's daughter to leave the premises, Chief Dodd obtained Southward's consent to enter and search the home.

Southward accompanied the officers during the search. Southward informed the officers that Cork was sharing a bedroom with Jerry. The door to Jerry's bedroom was open and did not have a lock. The officers obtained Southward's consent to enter and search the room. The officers discovered a gun holster, a gun cleaning kit, and a box containing thirty-four nine millimeter cartridges. The officers also found numerous shoeboxes under Jerry's bed. Among these shoeboxes was one Nike shoebox that contained approximately $50,620.00 in cash.

Agent Lewoczko went to Paducah, Kentucky, to examine the evidence that the Paducah police officers recovered. The money from the shoebox was stacked with rubber bands, and one of the bands had a money wrapper on it. The money wrapper bore a Union Planters Bank teller's initials and had the word "equality" written on it. (J.A. at 193). On June 9, 1998, the day of the search, Paducah police officers arrested Cork.

## B. Procedural History

On September 23, 1998, a federal grand jury sitting in the Western District of Ten-nessee returned a two-count indictment charging Cork with bank robbery in violation of 18 U.S.C. § 2113(a) and (d) [Count One], and with carrying and use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) [Count Two].

On January 27, 1999, Cork was arraigned and entered a not guilty plea. On March 26, 1999, Cork filed a motion to suppress. Subsequently, a magistrate judge held a hearing on Cork's motion to suppress, and on September 22, 1999, the magistrate judge issued a report and recommended that Cork's motion be denied. After conducting a de novo review of Cork's motion to suppress, the district court adopted the magistrate judge's report and recommendation denying the motion. The district court then set the matter for trial to begin on October 7, 1999.

At trial, Mallard and Amy Lane, the Union Planters Bank head teller, testified that they only had a quick glimpse of one of the bank robbers. Through the eye holes in his ski mask, both testified that they were able to see a small area of skin below the robber's eyes. Based on a quick glimpse, Mallard described the individual as possibly being a white male. Lane testified that the robbers spoke with a "black dialect." (J.A. at 188). Lane also testified that the money wrappers recovered at Armstrong's apartment and in the shoebox at Southward's residence originated from the Union Planters Bank. She testified that the money wrappers are removed prior to dispensing cash to customers.

Dwayne Armstrong's testimony at trial established that prior to the bank robbery he, Cork, Mario Gaudlin, and Lenzo Sherro had planned to rob Union Planters Bank. Armstrong testified that while he was incarcerated he spoke with Cork, and

Cork told him that he had decided to go through with the robbery and had planned to go to Paducah, Kentucky, to hide out. Fabian Jolivette and Marshal Ross, two of Cork's friends, testified that Cork visited them in Nashville, Tennessee, shortly after the robbery. They testified that Cork told them how he had planned and successfully completed the robbery, and fled to Paducah afterwards, and that Cork showed them a large sum of money and a nine millimeter pistol.

On October 15, 1999, after a six day jury trial, Cork was found guilty on both counts set forth in the indictment. On January 10, 2000, the district court sentenced Cork to a term of 110 months imprisonment as to Count One of the indictment, and 60 months imprisonment as to Count Two, with the terms to be served consecutively. The district court also sentenced Cork to a five year term of supervised release. On January 18, 2000, Cork filed a notice of appeal from the sentencing judgment.

## II. DISCUSSION

### A. Sufficiency of Evidence

Cork argues that the evidence supporting his conviction is insufficient to sustain a guilty verdict for armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d), and use of a firearm in the commission of a crime of violence in violation of 18 U.S.C. § 924(c). This Court reviews a claim of insufficient evidence "by determining whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. Hernandez*, 227 F.3d 686, 694 (6th Cir.2000) (citing *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir.1998) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979))). "This court must uphold a jury verdict if there is substantial evi-

dence, viewed in the light most favorable to the government, to support it." *United States v. Wells*, 211 F.3d 988, 1000 (6th Cir.2000) (citing *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)). "We do not weigh evidence, make credibility determinations, or substitute our judgment for the jury's verdict." *United States v. Crossley*, 224 F.3d 847, 855–56 (6th Cir.2000) (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)).

Cork argues that the evidence supporting his convictions for armed bank robbery is entirely circumstantial and therefore insufficient to sustain a guilty verdict. However, " '[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.' " *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir.1999) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (citing *United States v. Stone*, 748 F.2d 361, 362 (6th Cir.1984))).

Cork argues that the government's main witnesses, Armstrong, Ross, and Jolivette, are convicted felons and therefore their testimony lacks credibility. However, we recognize that "[c]hallenges to the credibility of a witness are not ... challenges to the sufficiency of the evidence, but instead are challenges to the quality of the government's evidence." *United States v. Latouf*, 132 F.3d 320, 330 (6th Cir.1997). "This court entitles 'special deference' to the jury's resolution of questions of credibility." *Id.* at 331 (quoting *Brown v. Davis*, 752 F.2d 1142, 1147 (6th Cir.1985)).

Cork directs this Court to certain evidence which he apparently considers exculpatory. Cork, an African–American male, suggests that Union Planters Bank employees Mallard and Lane testified that a white male participated in the robbery.

Cork's contention mischaracterizes the evidence. Mallard, in response to a question if she was certain a white male participated in the robbery, stated, "no, his skin just looked to be a lot lighter than the mask that was on, his skin looked white." (J.A. at 177). Lane testified that the bank robber, from a quick glance, "appeared white" but spoke with a "black dialect." (J.A. at 188). Therefore, based on this testimony a reasonable jury would not be precluded from concluding that an African–American male participated in the bank robbery, particularly since two robbers were involved.

■ Cork also suggests that "the clothing" that the police recovered contained hair evidence that did not match his hair. Appellant's Br. at 16. The clothing that the police discovered included a hat, t-shirt, pants, two sweatshirts, and a glove. However, only one item, a hooded sweatshirt, contained hair. Because two individuals participated in the bank robbery, the fact that the hair evidence did not match Cork's hair is hardly exculpatory. As Cork is well aware, the issues raised by the eyewitness testimony and the hair evidence were put to a jury, and accordingly we reject Cork's invitation to " 'weigh the evidence ... or substitute our judgment for that of the jury.' " *United States v. Marshall,* 248 F.3d 525, 536 (6th Cir.2001) (quoting *United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir.1993)).

■ Next, Cork contends that the government failed to establish a connection between him and the evidence, including the duct tape[1], the money wrappers, and the notebook, recovered from Armstrong's apartment. However, the government established that the police recovered from Armstrong's apartment a notebook that contained Cork's papers and bore the word "equality," as did the money wrapper found at Southward's residence. Also, Armstrong testified that he, Cork, and others planned the bank robbery at Armstrong's apartment. From this evidence, a reasonable juror could conclude that there was a connection between Cork and the evidence recovered at the apartment.

Cork also contends that the government failed to establish a connection between the money recovered at Southward's residence and the Union Planters Bank. Although he concedes that a portion of the money was still in a Union Planters Bank wrapper, Cork suggests that there was no connection between the non-wrapped currency and the bank. However, the government presented testimony that the police recovered both wrapped and non-wrapped currency in the same shoebox. Since the shoebox contained over $50,000 in United States currency, and a portion of the money was recovered in a Union Planters Bank wrapper, a reasonable juror could infer that all of the money originated from the Union Planters Bank.

■ Finally, Cork challenges the sufficiency of the evidence supporting his conviction for possession of a weapon during a crime of violence in violation of 18 U.S.C. § 924(c). Cork points out that since there was a discrepancy between Jolivette's description and the branch manager's description of the weapon from the robbery. At trial, Mallard described the weapon as box type pistol, while Jolivette testified that it was a nine millimeter. Based on this discrepancy, Cork contends that Jolivette's testimony is not credible. However, this Court "... refrain[s] from independently judging the credibility of

---

1. At trial, an expert in the area of paints, tapes, and plastics testified that one of the pieces of duct tape found at the bank was torn from the partial role of duct tape found at the apartment.

witnesses ..." *United States v. Welch,* 97 F.3d 142, 148 (6th Cir.1996) (citing *Jackson,* 443 U.S. at 319); *United States v. Collins,* 78 F.3d 1021, 1030 (6th Cir.1996). Moreover, the teller's testimony alone was sufficient to establish that a firearm was used during the commission of the bank robbery and, therefore, the jury could find the elements of the crime under 18 U.S.C. § 924(c).

In sum, viewed in the light most favorable to the government, there was sufficient evidence upon which any rational trier of fact could find the elements of the crime beyond a reasonable doubt. Accordingly, we reject Cork's contention that there was insufficient evidence to sustain his convictions for bank robbery and use of a weapon during a crime of violence.

### B. Motion to Suppress

"When considering the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo.*" *United States v. Johnson,* 242 F.3d 707, 709 (6th Cir.2001) (citing *United States v. Navarro–Camacho,* 186 F.3d 701, 705 (6th Cir. 1999)). To conclude that a district court's factual findings are in error, we must have the "definite and firm conviction that a mistake has been committed." *See id.* (citing *United States v. Ayen,* 997 F.2d 1150, 1152 (6th Cir.1993)). "[W]e must consider the evidence in the light most favorable to the government." *United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir.1993) (citing *Nat'l Eng'g & Contracting Co. v. OSHA,* 928 F.2d 762, 765 (6th Cir.1991)).

Cork contends that the warrantless search of the bedroom[2] and the seizure of his belongings violated the Fourth Amendment. Cork argues that the government

did not meet its burden in showing that Southward possessed the requisite common authority to consent to a search of her son's bedroom and the articles therein. The government, in turn, argues that Southward possessed the authority to consent to a search of her minor son's bedroom. The government contends that Cork had a diminished expectation of privacy in his belongings because he stored them in a common area of the bedroom and did not take any action to protect them from intrusion.

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (citations omitted). Proof of voluntary consent "may be established by showing that permission to search was obtained by a third party who possessed common authority over or other sufficient relationship to the premises or effect sought to be inspected." *United States v. Moore,* 917 F.2d 215, 223 (6th Cir.1990) (citing *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)).

Cork concedes that Southward freely and voluntarily consented to the search. As to whether Southward had "common authority" over her son's bedroom, Cork argues that the government failed to present any evidence as to Southward's authority over her son's room and how her authority supersedes her son's expectation of

---

**2.** The government conceded that Cork had standing to challenge the search at the suppression hearing. For purposes of our inquiry, we will assume that Cork has standing to challenge the search of the home where he was staying and the seizure of his belongings.

privacy in his bedroom. Cork notes that the government bears the burden of demonstrating that Southward possessed the requisite common authority to consent to the search of her son's bedroom. *See Rodriguez*, 497 U.S. at 181.

In *United States v. Clutter*, this Court upheld the consent given by twelve and fourteen year old children to a search of their mother's bedroom, reasoning that "mature family members possess the authority to admit police to look about the family residence, since in common experience family members have the run of the house . . . . [A]bsent special circumstances, all rooms in the residence can be said to be areas of usage common to all members of the family." 914 F.2d 775, 777–78 (6th Cir. 1990). This Court noted, however, that:

> It is, of course, conceivable that family members will exclude from this common authority access to areas where they wish to maintain an exception of privacy, even from other members of the family. Accordingly, courts are understandably reluctant to approve third-party consent searches of an enclosed space in which the family member targeted for the search has clearly manifested an expectation of exclusivity.

*Id.* at 777. Therefore, under *Clutter*, family members are deemed to have "common authority" over all areas in the home unless another family member has clearly manifested an intent to exclude others from an enclosed space.

■ Here, the police officers who conducted the search testified that the door to Jerry's bedroom was open and did not have a lock. They testified that they obtained specific consent from Southward, the homeowner, to enter and search the bedroom of her minor son, and that Southward accompanied them during the search. Finally, the officers testified that Southward made no indication that she

was restricted in any way from entering the bedroom. Therefore, the government's testimony reveals that there was no indication that either Jerry or Cork "clearly manifested an expectation of privacy" over Jerry's bedroom. Based on the officers' testimony, and in light of the standard of review, we cannot say that the district court clearly erred in concluding that Southward had common authority over her son's room.

Cork contends that even if Southward had common authority to consent to a search of her son's bedroom, that authority did not extend to the shoebox containing the money that the police recovered in the bedroom. Cork correctly notes that Southward's authority to consent to the search of the bedroom does not necessarily extend to the search of containers in the bedroom. *See, e.g., United States v. Salinas–Cano*, 959 F.2d 861, 865 (10th Cir. 1992) (holding that although defendant left his closed suitcase at his girlfriend's apartment, his girlfriend's consent to search of the suitcase was invalid).

■ Given the circumstances here, it was reasonable for police officers to believe that Southward's common authority extended to the shoebox. "Generally, consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container." *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir.2000) (citing *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). While a sealed container or locked suitcase may be entitled to a heightened expectation of privacy, *see United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir.1998), here Cork did not seal, tape, or lock the shoebox. Cork did not mark the shoebox to demonstrate that it was his property or that the contents were private. Cork did not conceal the shoebox

**384**

in the bedroom. Rather, he stored it next to other shoeboxes in a common area under the bed. Therefore, since Cork did not manifest any expectation of privacy, Southward's common authority extended to the shoebox. Accordingly, the district court properly denied Cork's motion to suppress.

### CONCLUSION

Viewed in the light most favorable to the government, there was sufficient evidence from which a reasonable jury could conclude that Cork was guilty beyond a reasonable doubt. The district court did not err in denying Cork's motion to suppress the evidence recovered at Southward's residence. Accordingly, we **AFFIRM** the judgment of Judge Bernice B. Donald of the United States District Court for the Western District of Tennessee.