RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0103p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

           *Plaintiff-Appellant,*

     *v.*

MARK TAYLOR,

           *Defendant-Appellee.*

No. 09-3019

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 08-00195—Solomon Oliver, Jr., District Judge.

Argued: March 9, 2010

Decided and Filed: April 13, 2010

Before: DAUGHTREY, GILMAN, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David M. Toepfer, ASSISTANT UNITED STATES ATTORNEY, Youngstown, Ohio, for Appellant. Anthony J. Vegh, LAW OFFICES, Cleveland, Ohio, for Appellee. **ON BRIEF:** David M. Toepfer, ASSISTANT UNITED STATES ATTORNEY, Youngstown, Ohio, for Appellant. Anthony J. Vegh, LAW OFFICES, Cleveland, Ohio, for Appellee.

     GILMAN, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. KETHLEDGE, J. (pp. 12-13), delivered a separate dissenting opinion.

_____

## OPINION

_____

     RONALD LEE GILMAN, Circuit Judge. After apprehending Mark Taylor on a state warrant for his arrest, law enforcement officers received permission from the female tenant of the apartment where he was found to search the premises. They discovered a closed shoebox labeled for a pair of men's basketball shoes. The shoebox was surrounded

and partially covered by men's clothing and lay in the corner of a closet in a spare bedroom that contained additional men's clothes. Acting without a search warrant and without making further inquiry, the officers opened the shoebox. The shoebox contained a handgun and ammunition that belonged to Taylor.

Upon being charged with being a felon in possession of a firearm and ammunition, Taylor moved to suppress the contents of the shoebox. The district court, after conducting an evidentiary hearing, granted Taylor's motion and suppressed evidence of the gun and the ammunition. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

In March 2008, members of the Northern Ohio Violent Fugitive Task Force received information that Taylor was at an apartment in Elyria, Ohio. The task-force officers had an outstanding warrant for Taylor's arrest based on a state offense, but did not have a search warrant for the apartment. Arriving at the apartment, the officers were met by Sabrina Arnett, the permanent tenant. The officers informed Arnett that they were looking for Taylor. Arnett initially denied that Taylor was in the apartment, but she gave the officers permission to search for him inside. She then admitted that Taylor was, in fact, in the apartment. The officers found Taylor on the second floor in the master bedroom, clad only in his underwear.

After arresting and handcuffing Taylor, the officers brought him down to the first floor, where Arnett had remained. The officers then asked Arnett for permission to search the apartment. She gave both verbal and written permission for the search. As described by one of the officers, the purpose of the search was to look for "any other stuff . . . [because] we suspected Taylor might have had some weapons because of his history." This suspicion—that Taylor might have a firearm—may explain why the task-force members at the scene included agents from the Bureau of Alcohol, Tabacco, Firearms and Explosives. In any event, the officers did not ask for Arnett's permission to search Taylor's belongings, nor did they ask Taylor for such permission.

When the officers had been on the second floor earlier to arrest Taylor, they had noticed men's clothes lying about in a spare bedroom. The officers returned to the spare bedroom during the subsequent search of the apartment and discovered that it contained a closet. This closet was strewn with men's clothes, children's clothes, and toys. On the floor of the closet, in a corner, the officers found a closed shoebox with a label indicating that it was for a pair of Nike brand Air Jordan men's basketball shoes, size ten-and-a-half. The shoebox was partially covered by a piece of men's clothing. Inside the shoebox, the officers discovered a handgun and ammunition, as well as a jail-identification bracelet belonging to Taylor.

After discovering the shoebox containing the handgun and ammunition, the officers interviewed Arnett, asking if anyone lived with her in the apartment. Arnett informed the police that Taylor did not live with her, but that she allowed him to store his belongings in the spare bedroom where the shoebox was found. No one else stored things in her apartment besides Taylor. Arnett stated that she "didn't really use the closet" where the shoebox was found; she used it only to store "stuff she had when [she] was a kid." The officers never asked Arnett if Taylor had given her permission to look through his personal belongings. According to Arnett, Taylor never granted her permission to look in the shoebox. He had been storing his possessions in the spare bedroom for roughly a month when the police arrived and had, at least initially, paid Arnett for allowing him to store his possessions there.

Taylor was subsequently indicted by a federal grand jury for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). His counsel filed a motion to suppress the incriminating items found in the shoebox, arguing that the evidence was the product of an illegal search. The district court conducted an evidentiary hearing on the motion. Three members of the task force testified, along with Arnett. After taking the matter under advisement, the district court issued an order granting the motion to suppress.

The district court made several key findings in its order. First, the court determined that Arnett did not have actual or common authority to consent to a search of Taylor's belongings because Taylor had not granted Arnett access to his property. Next, the court held that Arnett did not have apparent authority to consent to a search of the shoebox. The

court reasoned that because the spare bedroom and the closet contained men's clothes and because the shoebox was partially covered with a piece of men's clothing, the ownership of the shoebox was ambiguous. In reaching this conclusion, the court found that the task-force officers in fact believed that the shoebox belonged to Taylor when they opened it.

The government now appeals the grant of the motion to suppress.

## II. ANALYSIS

### A.       Standard of review

We review a district court's factual findings on a motion to suppress under the clear-error standard and review its legal conclusions de novo. *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008). When reviewing these factual findings, we consider "the evidence in the light most likely to support the district court's decision." *United States v. Keith*, 559 F.3d 499, 503 (6th Cir. 2009).

### B.       Apparent authority

Taylor concedes that Arnett, as the apartment's tenant, gave permission to the law enforcement officers to search the premises. In the spare bedroom, the officers found a closed but unsealed shoebox belonging to Taylor, which they opened and thereby discovered the incriminating evidence. Such searches are constitutionally permissible if the government can "show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the . . . effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171-72 (1974).

In the district court, the government argued that Arnett had actual or common authority over Taylor's shoebox. The court rejected the government's claim, finding that Taylor exercised exclusive control over the shoebox and never gave Arnett permission to open it.

On appeal, the government has dropped its argument that Arnett had any such actual or common authority. Instead, the sole argument it now asserts is that Arnett had *apparent* authority to consent to a search of the shoebox. The apparent-authority doctrine excuses otherwise impermissible searches where the officers conducting the search "reasonably

(though erroneously) believe that the person who has consented" to the search had the authority to do so. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). This court's decision in *United States v. Waller*, 426 F.3d 838 (6th Cir. 2005), a case that both parties and the district court discuss in detail, further explains the apparent-authority doctrine:

> When one person consents to a search of property owned by another, the consent is valid if the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting party had authority over the premises. Whether the facts presented at the time of the search would warrant a man of reasonable caution to believe the third party has common authority over the property depends upon all of the surrounding circumstances. The government cannot establish that its agents reasonably relied upon a third party's apparent authority if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry. Where the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, warrantless entry without further inquiry is unlawful.

*Id.* at 846 (alterations, citations, and internal quotation marks omitted). Moreover, "[t]he government bears the burden of establishing the effectiveness of a third party's consent." *Id.* at 845 (citing *Rodriguez*, 497 U.S. at 181).

The government in the present case argues that Arnett had apparent authority to consent to a search of the shoebox because a shoebox is not the type of container that commands a "high degree of privacy," unlike luggage and footlockers. Furthermore, the government emphasizes that other items besides men's clothes were in the closet, including children's clothes and toys. Taylor responds that there is no per se rule that certain containers provide no expectation of privacy. He argues that the circumstances as a whole demonstrate that the ownership of the shoebox was at the very least ambiguous, and that the officers made no inquiry to resolve the ambiguity.

Utilizing the standard in *Waller*, we find Taylor's and the district court's analysis more compelling than the government's. Concededly, the officers began the search with the reasonable belief that most items within the apartment were subject to Arnett's mutual use, given that she was the sole tenant of the apartment. The officers, however, had noticed

men's clothes in the spare bedroom when they arrested Taylor. This would indicate to a reasonable officer that the clothing might belong to a visitor or a guest like Taylor.

Upon conducting a full search of the apartment, the officers found more men's clothes in the spare bedroom's closet. This again indicated that someone besides Arnett was using this space—most likely Taylor because he was found in a nearby bedroom in his underwear. Although Arnett had no children, the closet in the spare bedroom contained a mix of children's clothes, toys, and men's clothes. Underneath an item of men's clothing lay the closed shoebox. In short, nothing in the closet indicated that the items within it belonged to Arnett or were regularly used by her. Under these circumstances, when the officers discovered and were considering whether to open the shoebox, a reasonable person would have had substantial doubts about whether the box was subject to mutual use by Arnett.

Our conclusion is further reinforced by the district court's factual finding that "the police would likely not have opened the closed shoebox if they believed it belonged to Arnett. Rather, they opened the shoebox precisely because they believed it likely belonged to Taylor." Such a factual finding—that the officers believed the shoebox belonged to Taylor before they opened it—further strengthens Taylor's argument that a reasonable officer in these circumstances would have had substantial doubts about whether the shoebox was mutually used by both Taylor and Arnett. Although many items that belong to a houseguest like Taylor might also be used by the dwelling's resident (such as books, compact discs, magazines, or a portable stereo), a shoebox that is surrounded by the guest's clothes and that sits in the corner of a closet in a little-used room is not likely to be such an item. We review the above factual finding under the clear-error standard, *see United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008), and the government has, in fact, not contested that finding.

Comparing the facts of the present case to those in *Waller* solidifies our conclusion. In that case, Waller stored a suitcase and several filled garbage bags at a friend's apartment. *Waller*, 426 F.3d at 842. His friend had never looked in the luggage or the garbage bags and did not know what Waller was storing in them. *Id.* After Waller was arrested for violating the conditions of his bail bond, his friend gave the police permission to search the apartment.

*Id.* The police found Waller's suitcase in a closet, opened it, and discovered two guns inside. *Id.* Waller's motion to suppress was denied by the district court, but this court reversed, holding that whether Waller's suitcase was "subject to mutual use" by Waller's friend was unclear under the circumstances. *Id.* at 847 (internal quotation marks omitted). As a result, Waller's friend did not have apparent authority to consent to the search of the suitcase. *Id.* at 847-49.

The case before us presented the officers with even more ambiguities than did *Waller*. There, the main argument for ambiguity was that the police found a packed suitcase and were told that Waller was storing items in his friend's apartment. But there is no description in *Waller* of where the suitcase was found, other than in "a closet," or whether the suitcase was next to other items that obviously belonged to Waller or whose ownership was unclear. Here, the appearance of the shoebox itself and the items in the room where the shoebox was found indicated that the box did not belong to Arnett. There were apparently no such surrounding items in *Waller*, yet this court still suppressed the contents of Waller's suitcase.

Furthermore, this court in *Waller* noted that "[t]he expectation of privacy in one's luggage is not lessened by storing it on the premises of a third-party. Rather, the 'expectations may well be at their most intense when such effects are deposited temporarily or kept semi-permanently . . . in places under the general control of another.'" *Id.* at 848 (alteration in original) (quoting *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978)). A shoebox is concededly not "luggage," but it is an often-used storage container, and Taylor unquestionably had stored his shoebox in Arnett's apartment. Arnett also testified that she had never looked in the shoebox and did not have permission from Taylor to do so.

Additional support for the district court's conclusion that there was ambiguity about mutual use of the shoebox is found in *Waller*'s discussion of the Tenth Circuit's decision in *United States v. Salinas-Cano*, 959 F.2d 861 (10th Cir. 1992). The Tenth Circuit in *Salinas-Cano* suppressed the results of a search of luggage that the defendant had left at his girlfriend's apartment, even though she had given the police specific consent to search the luggage. *Salinas-Cano*, 959 F.2d at 862. In its analysis, the Tenth Circuit noted several factors that it took into consideration: (1) the type of container and whether that type

"historically command[ed] a high degree of privacy," (2) whether the container's owner took any precautions to protect his privacy, (3) whether the resident at the premises initiated the police involvement, and (4) whether the consenting party disclaimed ownership of the container. *Id.* at 864. Applying these factors,

> [t]he Tenth Circuit held the search of the suitcase unlawful because it was a type of container long associated with privacy expectations, the defendant had . . . never permitted his girlfriend to look inside the suitcase, he had not abandoned the suitcase but instead maintained a periodic presence in the apartment, and the agents had not questioned his girlfriend in a manner sufficient to determine whether she had mutual use of the defendant's suitcase.

*Waller*, 426 F.3d at 848 (citations and internal quotation marks omitted).

An analysis of these factors leads us to the same conclusion in the present case. Although shoeboxes do not "historically command a high degree of privacy," *see Salinas-Cano*, 959 F.2d at 864, they are often used to store private items, such as letters and photographs. Taylor took precautions to manifest his expectations of privacy by closing the shoebox, putting it in the corner of a closet in a little-used room, partially covering it with an item of his clothing, and not granting Arnett permission to look inside. Like the defendant in *Salinas-Cano*, Taylor had not abandoned the shoebox, and in fact appeared to be staying at Arnett's apartment, at least temporarily. *See id.* at 865. Nor did Arnett initiate the involvement by the police in any way. *See id.* at 864 (explaining that "courts have generally been more forgiving of searches" that are conducted upon the initiative of the dwelling's permanent resident). Finally, similar to the facts in *Salinas-Cano*, the officers here never questioned Arnett about whether she had mutual use or control of the shoebox. *See id.* at 866.

The government responds by insisting that the present case compares favorably to this court's unpublished opinion in *United States v. Cork*, 18 F. App'x 376 (6th Cir. 2001). But the facts of *Cork* are inapposite. In that case, law enforcement officers received permission to search the home where Cork was staying from the home's owner, Cork's aunt. *Id.* at 378-79. Cork was sharing a bedroom with his cousin, his aunt's 16-year-old son. *Id.* at 379. Officers searched the bedroom, including the contents of numerous shoeboxes

underneath the cousin's bed.  *Id.*  One of those shoeboxes contained evidence that incriminated Cork.  *Id.*

Beginning with the most obvious factual distinction, the shoebox in *Cork* that contained the incriminating evidence was found underneath the bed of Cork's *cousin*, not his own.  Given the perfectly reasonable assumption that items stored underneath a person's bed usually belong to that person, this fact alone strongly distinguishes *Cork*.  Circumstances in the present case indicated that the shoebox belonged to Taylor and, in fact, the district court found that the officers believed that the shoebox *was* Taylor's before they opened it.  In *Cork*, however, the shoebox's location alone strongly indicated that it belonged to Cork's cousin, not Cork himself.

Another key distinction is that Cork's aunt had apparent authority to grant permission for the officers to search the unlocked bedroom and unsecured possessions of her minor son.  *See United States v. Clutter*, 914 F.2d 775, 777-78 (6th Cir. 1990) (explaining that "mature family members possess the authority to admit police to look about the family residence," although this excludes areas where a family member "has clearly manifested an expectation of exclusivity").  This strongly contrasts with the present case because Taylor was storing his belongings in an unrelated person's apartment, where expectations of privacy are much greater.  *See Waller*, 426 F.3d at 848 ("[E]xpectations [of privacy] may well be at their most intense when such effects are deposited temporarily or kept semi-permanently . . . in places under the general control of another." (citation and internal quotation marks omitted)).

The closest *Cork* comes to supporting the government's argument is the decision's observation that "[w]hile a sealed container or locked suitcase may be entitled to a heightened expectation of privacy, here Cork did not seal, tape, or lock the shoebox." *Cork*, 18 F. App'x at 383 (internal citation omitted).  Likewise, Taylor's shoebox was not sealed, and a shoebox is not a container that historically has enjoyed heightened expectations of privacy. *See United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978).  But this does not equate to a per se rule that shoeboxes are never entitled to expectations of privacy in the Fourth Amendment context.  Rather, we must consider the entirety of "the facts available to the officer at the moment" of his decision.  *See Waller*, 426 F.3d at 846 (internal quotation

marks omitted). Here, those facts demonstrate that there was ambiguity as to whether Arnett had mutual use or control of the shoebox found in the closet.

The parties also compare the present case to this court's decision in *United States v. Purcell*, 526 F.3d 953 (6th Cir. 2008). In that case, law enforcement officers arrested Purcell outside of a hotel room that he had rented with his girlfriend. *Id.* at 957. After the girlfriend gave consent for the officers to search the room, they opened a bag that she had said was hers. *Id.* at 957-58. That bag, however, contained only men's clothes. *Id.* at 958. The agents nevertheless continued to search through the various bags in the room, finally discovering a firearm in a backpack. *Id.* Purcell was the sole user of the backpack. *Id.* This court held that, after the officers discovered that the girlfriend had wrongly asserted that the first bag was hers, "ambiguity clouded [her] authority to consent to a search of the backpack." *Id.* at 964.

The facts of *Purcell* are comparable to those in the present case because the officers here found Taylor's clothes on and around the shoebox, like the officer who found that the bag that Purcell's girlfriend had claimed was hers in fact contained Purcell's clothes. In *Purcell*, the discovery of his clothes created ambiguity about the girlfriend's authority to consent to a search of any further bags. *Id.* The discovery of Taylor's clothes in the spare bedroom and in the closet created a similar ambiguity regarding Arnett's ability to consent to the search of the shoebox.

This court noted in *Purcell* that "[o]nce ambiguity erases any apparent authority, it is not difficult for searching officers to reestablish the would-be-consenter's authority," explaining that the officers could have resolved the ambiguity by simply asking the girlfriend, who was standing outside, what bags she was using. *Id.* A similar situation existed in the present case. While the officers were searching the spare bedroom, Arnett and Taylor were within easy reach downstairs. Upon finding the closed shoebox in the closet of an unused room with men's clothes on and around it, and believing that the shoebox was likely Taylor's, the officers could easily have gone downstairs and asked Arnett "to clarify her authority over" the shoebox, or asked Taylor if the shoebox was his. *See id.* But they chose not to do so. Nor, of course, did they pause to obtain a proper search warrant.

In sum, given all of the circumstances surrounding the search of the shoebox, the district court's factual finding that the officers believed that the shoebox likely belonged to Taylor, the favorable comparison to this court's decisions in *Waller* and *Purcell* and to the Tenth Circuit's decision in *Salinas-Cano*, and the factual contrast with *Cork*, we conclude that there was ambiguity over whether Arnett had mutual use or control of the shoebox. The officers failed to cure this ambiguity by asking either Arnett or Taylor to clarify the situation. *See Waller*, 426 F.3d at 846. As a result, Arnett lacked apparent authority to consent to the search of the shoebox.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

———————————————

**DISSENT**

———————————————

KETHLEDGE, Circuit Judge, dissenting.  The majority today extends to shoeboxes a degree of Fourth Amendment protection that our court has previously afforded to luggage.  I agree that our precedents permit this extension, but I do not think they compel it.  I dissent because I think the extension unwise.

The apartment's tenant here gave consent for the officers to search it.  I think that consent ought to be effective as to an unsecured container on the premises, absent a clear indication that some other person exclusively controls the container.  Luggage might routinely meet that test, but shoeboxes I think should not, absent some unusual circumstance not present here.  It should take more than a shoebox to vitiate a resident's consent to search the premises.

I am not alone in this general view.  Writing for the court in *United States v. Melgar,* 227 F.3d 1038 (7th Cir. 2000), Judge Wood observed:

> In a sense, the real question for closed container searches is which way the risk of uncertainty should run.  Is such a search permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented to the search (Melgar's view), or is it permissible if the police do *not* have reliable information that the container is *not* under the authorizer's control.  We are not aware of any case that has taken the strict view represented by the first of these possibilities.

*Id.* at 1041 (emphasis in original).  Judge Wood chose the second approach, observing that "[a] contrary rule would impose an impossible burden on the police.  It would mean that they could *never* search closed containers within a dwelling (including hotel rooms) without asking the person whose consent is being given *ex ante* about every item they might encounter."  *Id*. at 1042 (emphasis in original).  I too would follow Judge Wood's second approach.  Our court today follows something much like the first.

The circuits are split on this issue.  In addition to the Seventh Circuit, the Second has followed more or less the rule I advocate here.  *See United States v. Snype*, 441 F.3d 119, 136 (2d Cir. 2006) (upholding search of defendant's knapsack, because the apartment

owner's "open-ended consent would permit the search and seizure of any items found in the apartment with the exception of those obviously belonging to another person" (internal quotation marks omitted)). Even our court has come out the other way in another shoebox case that I think materially indistinguishable from this one. *See United States v. Cork*, 18 F. App'x 376, 383 (6th Cir. 2001). Cases in still other circuits are admittedly to the contrary. To my knowledge, the Supreme Court has never decided specifically the extent to which a resident's consent to search her premises is effective as to containers within it. The result has been appreciable entropy among the circuits.

I respectfully dissent.