**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0157n.06

Case No. 19-5522

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

Mar 16, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| CRAIG HOWARD, | ) | |
| | ) | **O P I N I O N** |
| Defendant-Appellant. | ) | |

BEFORE: SUTTON, McKEAGUE, and DONALD, Circuit Judges.

**McKEAGUE, Circuit Judge.** Defendant Craig Howard, convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), argues the police violated the Fourth Amendment in their warrantless search that uncovered his firearm. The police, however, obtained consent before proceeding with the search. But Howard argues the consent here was insufficient for three main reasons: first, the consenting third party didn't have actual or apparent authority to consent; second, even if she did, she didn't voluntarily consent; and third, he expressly refused consent. The district court found no Fourth Amendment violation after considering Howard's challenges, and we agree. We therefore affirm.

## I.  Background

Officer Stephen Westrich of the Memphis Police Department was assigned to the Ridgeway precinct task force on April 3, 2017.  While patrolling the area, a Nissan Maxima parked in a driveway caught his attention because it was listed on the stolen vehicle list.  After running the tags, Officer Westrich confirmed the Nissan was stolen, and the accompanying incident report informed him that two armed African-American males were the suspects.

Officer Westrich called for back-up and all officers surveilled the scene.  As soon as a woman, who later turned out to be Evelyn Harris (the defendant's girlfriend), exited the house and approached the vehicle, officers detained her.  At one point, the door to the house was open and officers on the scene observed two African-American males in the doorway.  While other officers were at the front of the residence dealing with Harris, Officer Westrich secured the back of the house.  Meanwhile, the officers in the front were detaining individuals in the house and placing them in separate squad cars, including Howard.  Upon returning to the front of the house, Officer Westrich then questioned three individuals placed in the squad cars to ask if anyone was a leaseholder.  All denied being a leaseholder.  Officer Westrich then joined his fellow officers inside.  At this point, he encountered Laquita McAbee, who had several children with her and was waiting in the living room.  She was the only adult individual who remained in the house.  Officer Westrich approached her and asked if she was the leaseholder to the house.  Like the others, she answered no.  He then asked if she lived in the residence, and she confirmed she did.  Officer Westrich explained to McAbee that he wanted to search the house and would like her consent.  He also explained that, with a consent search, the officers would not be able to "tear up [her] home," while they would be able to if they had to go get a search warrant.  Officer Westrich handed her a consent to search form, which she signed.  She also verbally agreed to the search.  Officer Westrich

then proceeded upstairs and entered the unlocked bedroom on the left, which later turned out to be Harris's and Howard's bedroom (not McAbee's). Officer Westrich went about his usual search, "[l]ifting, looking, making sure there was nothing there." And he discovered a firearm under the mattress—the firearm illegally possessed by Howard.

Ultimately, a grand jury returned a one-count indictment charging Howard with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Howard moved to suppress any and all evidence obtained as a result of the warrantless search of the house on April 3. A suppression hearing followed.

At the suppression hearing, more details emerged about the household. Howard shared a room with his girlfriend, Harris, but Howard was not the leaseholder nor did he pay rent. McAbee (also not the leaseholder) claimed that she paid most of the rent and slept in the room across the hall. McAbee lived at the house with three of her siblings—including Harris and two brothers—along with five children. McAbee testified that their younger sister was the owner or leaseholder, but that the younger sister had never lived at the house. McAbee maintained the household with Harris, and McAbee often took care of the kids, including her own child and Harris's four children. McAbee testified that she respected Howard's and Harris's privacy and would often ask before entering their room. However, McAbee also acknowledged she could go in their room. Notably, when the police arrived, McAbee went into Harris's room to pick up Harris's and Howard's child before heading downstairs to the living room.

The district court ultimately concluded there was no Fourth Amendment violation, finding that apparent authority existed for McAbee to consent to the search, or in the alternative, that the police acted in good faith. We need not reach the question of good faith because we find McAbee had apparent authority and no unlawful search resulted.

## II. Analysis

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. And it "generally prohibits the warrantless entry of a person's home . . . to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted). But this prohibition doesn't apply to situations where "voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Id.* (citations omitted). Common authority exists where there is "mutual use of the property by persons generally having joint access or control for most purposes," and the government bears the burden of demonstrating this. *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). And in making this determination, we view the evidence in the light most favorable to the government when the government prevailed below. *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993). We review the district court's legal determinations de novo and its factual determinations for clear error. *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001).

### A. Actual Authority

The district court first determined that McAbee had actual authority to consent to the search of the residence generally, and we agree. "[T]here is every reason to suppose that mature family members possess the authority to admit police to look about the family residence." *United States v. Clutter*, 914 F.2d 775, 777 (6th Cir. 1990). Indeed, "absent special circumstances, all rooms in the residence can be said to be areas of usage common to all members of the family." *Id.* That's exactly the case here. The district court found the house to be a family residence, for McAbee lived there with three of her siblings. In addition to these findings, the record reflects that McAbee paid a large portion of the rent and took care of Harris's four children.

### B. Apparent Authority

Of course, it's "conceivable that family members will exclude from this common authority access to areas where they wish to maintain an expectation of privacy, even from other members of the family." *Id*. Accordingly, the more specific question remains whether McAbee's consent extended to her sister's bedroom where Officer Westrich found the firearm—and crucially, whether it extended to the mattress. It did.

To answer this question, the district court analyzed only whether McAbee had apparent authority to consent to the search of her sister's bedroom because "the parties maintained at the Suppression Hearing that McAbee did not, in fact, have actual authority to consent to the search of her sister's bedroom where Defendant stayed." We take the same route as the district court. "Because we agree with the district court's decision that [McAbee] had apparent authority, we need not consider whether she also possessed actual authority." *United States v. Gillis*, 358 F.3d 386, 391 (6th Cir. 2004).

Apparent authority exists where the factual circumstances "available to the officer at the moment" would "warrant a man of reasonable caution in the belief that the consenting party had authority over the premises[.]" *Rodriguez*, 497 U.S. at 188 (internal quotations and citation omitted). And this inquiry depends on "all of the surrounding circumstances." *United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005).

Looking at the surrounding circumstances available to Officer Westrich, the district court found ample evidence supported Officer Westrich's belief that apparent authority existed: McAbee had all four children by her side when asked for consent, McAbee signed a consent-to-search form that authorized a "complete search," the bedroom where the firearm was located was

unlocked, and McAbee said she lived there and no other detained individual indicated leaseholder status. We agree.

In fact, these are just the type of circumstances that give rise to apparent authority. When someone in a residence answers the door with a child, it's reasonable for an officer to expect she has access to the residence. *Georgia v. Randolph*, 547 U.S. 103, 111 (2006). McAbee had children with her when consenting, and another child had been in the very bed where Officer Westrich found the firearm. Moreover, the room was unlocked. *See Clutter*, 914 F.2d at 778 (finding minor children had common authority to consent to inspection of parent's open bedroom); *United States v. Cork*, 18 F. App'x 376, 383 (6th Cir. 2001) (finding homeowner had common authority to consent to unlocked bedroom shared by nephew); *Pratt v. United States*, 214 F. App'x 532, 537 (6th Cir. 2007) (Merritt, J., dissenting) (noting that "had Pratt left his door unlocked or provided his mother a key, there would be little doubt that Ms. Pratt would have had actual common authority"). In *Pratt*, this court even found a mother had authority to give consent to her *locked* son's room, even though she didn't have the key. *Pratt*, 214 F. App'x at 535–36.

Because McAbee had apparent authority to consent to the search of her sister's bedroom, that consent extended to the largest object in plain view: the mattress. "Generally, consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container." *Cork*, 18 F. App'x at 383 (quoting *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000)).

Howard disagrees. He argues that not every area in a family residence can automatically be considered "common area." And he argues that where there is sufficient ambiguity surrounding joint access or mutual use, apparent authority will not reasonably exist if the searching officers don't take steps to confirm authority. *See Waller*, 426 F.3d at 849. According to Howard, Officer

Westrich was willfully blind to the ambiguities surrounding McAbee's consent, and "[d]eliberate ignorance of conclusive ownership . . . does not excuse the warrantless search." *Id*. And therefore, as Howard says, there wasn't apparent authority to search the room or the mattress, more specifically. Not so.

As for the room, Howard cannot escape our clear precedent that family relationships and unlocked doors often indicate *actual* authority. *See Clutter*, 914 F.2d at 778; *Cork*, 18 F. App'x 376 at 383; *Pratt*, 214 F. App'x at 535–36. And there was no evidence to suggest—at the time of the search—that McAbee didn't have joint access to the room. Without doubt present, "the rule established in *Waller* does not apply to this case." *United States v. Clay*, 630 F. App'x 377, 385 (6th Cir. 2015).

As for the mattress, Howard analogizes it to closed containers to argue that, without further factual findings, it was unreasonable for Officer Westrich to believe McAbee's apparent authority extended to the mattress area. And Howard cites one unreported district court opinion where the court found apparent authority didn't extend to a mattress. *See United States v. Brown*, No. CR 14-125-BLG-SPW-2, 2015 WL 3562558, at *2–4 (D. Mont. June 5, 2015). Howard's arguments fall short.

First, Officer Westrich reasonably thought McAbee had access to the room searched (or that it was her room), so that necessarily includes the mattress. Second, regardless, our circuit has never likened a mattress to a closed container such as a piece of luggage, a duffel bag, or a shoebox. But even if we assume that the underside of a mattress is like a closed container, our authority still doesn't help Howard. Again, there wasn't any evidence in the room or surrounding the mattress that would lead Officer Westrich to question McAbee's authority. *Cf. United States v. Purcell*, 526 F.3d 953, 964 (6th Cir. 2008) (finding sufficient ambiguities where duffel bag contained men's

clothing when consenting party was a woman); *United States v. Taylor*, 600 F.3d 678, 681–82 (6th Cir. 2010) (finding sufficient ambiguities surrounded a closed shoebox at the bottom of a closet that contained men's clothing when the consenting party was a woman). Nor did the police search the mattress precisely because they suspected it *wasn't* McAbee's. *Cf. Waller*, 426 F.3d at 847 (reasoning police wouldn't have opened a suitcase if they thought it belonged to the consenting party because the consenting party wasn't a suspect). Instead, the facts here are more like those in *Cork*, where this court found apparent authority extended to a shoebox under a bed located in an unlocked room. 18 F. App'x at 383–84. Without ambiguities present as to use and access, Officer Westrich reasonably believed McAbee had apparent authority to consent to the search.

## C. Voluntary Consent

Next, Howard argues McAbee didn't voluntarily consent to the search. "Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'" *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Factors include "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quotation and citation omitted). A "district court's decision regarding consent will not be overturned unless it is clearly erroneous." *Id.* at 384 (quotation and citation omitted); *Carter*, 378 F.3d at 587.

The district court adopted the magistrate judge's finding that McAbee voluntarily consented to the search. McAbee was thirty-five years old, has a high school education, and was employed as a computer repair technician and as a singer. McAbee acknowledged that, when

giving consent, no officer yelled, brandished a gun, threatened her, or handcuffed her. Officer Westrich described McAbee as "calm and polite and cooperative" at the time consent was obtained. McAbee stated she thought the officers already had permission to be in the house, but regardless, she would have given consent anyway. Further, Officer Westrich testified that, when giving McAbee the consent to search form to sign, he told her "[n]obody here can make you do it." Either way, knowledge of one's right to refuse is but one factor in the analysis, and it alone is not determinative. *Schneckloth*, 412 U.S. at 232–33. It's worth noting that both the district court judge and magistrate judge were concerned about Officer Westrich's alleged comment to McAbee that he "could go get a search warrant and with a consent to search [he] can't tear up your home, with a search warrant [he] can tear up your home." But in light of the other factors, the district court still found that McAbee voluntarily consented, and based on the evidence presented, we aren't left with a definite and firm conviction the district court made a mistake.

### D. Objection to the Search

Whether or not Howard expressly objected to the search, *Fernandez v. California* controls our decision. 571 U.S. 292 (2014). In that case, Fernandez objected to a search of his apartment, where he lived with his girlfriend. *Id.* at 296. The police then lawfully arrested him. *Id.* Later, a detective returned to the apartment and received consent from the girlfriend. *Id.* The Court found Fernandez was not "present" when the girlfriend consented and held that "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." *Id.* at 302–03. And Fernandez's earlier objection did not remain effective. *Id.* at 302. So too here. If Howard did object (we're not saying that he did), he did so before he was lawfully arrested. He was then placed in the back of a squad car. Later, Officer Westrich entered the house, at which point he asked McAbee for consent. Howard was not present when

McAbee gave consent. *Id.* at 299–300 (finding defendant in *Matlock*, who was arrested in the front yard and placed in a squad car, was "absent") (citing *Matlock*, 415 U.S. at 170). And Howard's earlier objection did not remain effective. *Id.* at 302.

### III. Conclusion

For these reasons, we affirm.