WIGGINS, Justice.
A police officer conducted a warrantless search of a closed backpack belonging to the defendant. The officer relied on a third party’s consent in conducting the search. The third party possessed actual authority to consent- to a search of the bedroom the backpack was in but lacked actual authority to consent to a search of the backpack-itself. The defendant moved to suppress the evidence found in the backpack and the fruits of the search on the ground that the third party had neither actual authority nor apparent authority to consent to the search of the backpack. He argued the warrantless search violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution .and article I, section 8 of the Iowá Constitution. The district court denied the motion.
The defendant now seeks further review of a decision by the court of appeals affirming his convictions on two counts of robbery in the second degree. We conclude the warrantless search violated the Fourth Amendment of the United States Constitution because the third party who consented to the search of the bedroom lacked apparent authority to consent to the search of.. the defendant’s backpack. Therefore, we vacate the decision of the court of appeals, reverse the judgment of *425 the district court, and remand the case to the district court for a new trial.
I. Background Facts,
On our de novo review, we find the following facts. At 12:35 a.m. on December 31, 2012, the Iowa City Police Department dispatched Officer Michael Smithey to Gumby’s Pizza after .receiving a report an armed robbery had just taken place. When Officer Smithey. arrived on the scene, the robbery victim met him outside the restaurant. The victim reported he had been alone working in the kitchen when two black males entered the restaurant wearing dark clothes, black hats, and black bandanas over their faces.. One of the men had a gun and pointed it at the victim. The men ordered the victim to open the cash register. The victim complied and gave the men approximately $125 in small bills. • After the men ran out of the' store and headed northbound on Gilbert Street, the victim locked the door and called the police.
As Officer Smithey stood outside the restaurant speaking with the victim, a man approached and asked if there had been a robbery. The man stated he had just been standing outside smoking a cigarette when he observed two black males wearing dark clothes walk by. He noted one' of the men appeared to be holding a fistful of cash. He also stated when the men saw him, they took off running between some houses.
■ Officer Smithey drove the witness to the location where he had'last seen the men on foot. There was fresh snow on the ground, and Officer Smithey saw what appeared to be tracks in the snow. He then requested backup from a canine unit.
When the canine unit arrived, the handling officer and the canine tracked the suspects to the southeast corner of the building on South-Gilbert Street. Officer Smithey followed, joined- by Officer Alex Strieker. The officers observed the lower floor of the building was a retail location, but the second story contained apartments with outside doors accessed by a common stairwell in the rear of the building. As the officers visually surveyed the exterior of the building, they saw the lights were on in one of the apartments and a tall black male who appeared to be very interested in what the- officers were doing was looking out the window.' 'The officers noticed the man appeared to match the descriptions of the suspects and quickly ducked out of sight when he saw the officers look up at him. The-officers decided to approach the apartment. When they arrived at. the front door to the apartment, they noticed someone had turned the lights off inside. As they stood outside the apartment door, they heard it lock from the inside. Officer Smithey then knocked on the door and announced the officers’ presence.
A tall black male named Wesley Turner answered the door. The officers explained why they were there, and Turner allowed them inside. The officers entered the living robin where they encountered Turner’s girlfriend, Alyssa Miller, who also lived in the apartment. Turner ánd Miller indicated the only other person in the apartment was their roommate, Gunner Olson. Turner told the officers Olson was asleep' in his room but agreed to wake him so the officers could speak with -him. After Turner knocked on the bedroom door,-Olson, who was also a. black male, emerged from his room.
The officers decided to speak to the two men separately. Officer Strieker stepped outside to speak with ’Turner.' During their brief conversation, Turner indicated he had remained in the apartment since arriving home from work around n,ine and had'not seen anything suspicious. ■
*426 Meanwhile, Officer Smithey stepped into the kitchen to speak with Olson. Olson confirmed he lived.in the apartment along with Turner and Miller. Officer Smithey asked Olson if he could peek inside his bedroom. Only then did Olson tell Officer Smithey his cousin Marvis was sleeping in his bed. Olson told Officer Smithey that Marvis arrived sometime after he went to sleep earlier that evening. When asked, Olson indicated he did not know Marvis’s last name and explained they were not really cousins. Officer Smithey did not ask Olson if Marvis had been staying in the apartment.
Olson then led Officer Smithey back to his bedroom. Officer Strieker looked on from the hallway, having just finished his conversation with Turner. Inside the room, the officers saw a shirtless black male in green pajama pants lying on the air mattress in the corner. The air mattress was the only mattress in the room. At the officers’ request, Olson roused the man by shaking him, but the officers noticed that waking the man appeared to be considerably more difficult than it should have been. The officers also noticed the shirtless man was sweaty, which they thought odd because no one else in the apartment was sweating.
The man identified himself as Marvis Jackson. When asked if he had identification, Jackson indicated he did not. The officers had a brief conversation with Jackson, during which neither officer asked Jackson if he had been staying in the apartment, was an overnight guest, or had any personal belongings in the apartment. When the officers ran a check on Jackson’s name, they discovered an outstanding warrant for his arrest for another armed robbery that took place at a gas station in November.[1] Officer Smithey notified Jackson he was under arrest, handcuffed him, and walked him out of the room. By that time, other officers had arrived at the apartment. Officer Smithey passed Jackson off to another officer for transport before returning to the bedroom.
While Officer Smithey was outside the bedroom passing Jackson off for transport, Officer Strieker spoke to Olson. Olson again indicated Jackson had arrived earlier that night after he had gone to sleep. Officer Strieker did not ask Olson if Jackson had been staying in the apartment, but Olson clearly indicated Jackson did not permanently reside in his bedroom. When asked if there were any guns in the room, he replied oddly that there should not be or that he did not know of any.
Officer Strieker then asked to search the bedroom for guns or any evidence of the robbery, and Olson consented to the search. Officer Strieker waited for Officer Smithey to return to the room. When Officer Smithey arrived, Officer Strieker informed him that Olson had consented to the search, and Olson confirmed he did not mind if Officer Smithey conducted the search. Neither officer asked Olson whether any of the items in the room might belong to Jackson. Officer Strieker then stepped outside the room with Olson to accompany him to the kitchen to get a glass of water.
Officer Smithey began searching Olson’s room. He first searched the area around the air mattress. He searched under the sheets and blankets on top of the air mattress and then under the mattress itself. He then grabbed a backpack sitting a few feet away on the floor along the wall next to or partly inside the closet door, which *427 was partially off its hinges. He placed the backpack on the chair sitting between the closet and the air mattress. The backpack was closed and had no obvious identifying marks or tags on its exterior indicating who owned it. Officer Smithey opened the backpack. He reached inside and located a wallet, which he removed and laid on the chair without opening it. When Officer Smithey reached inside a second time, he located a pair of dark jeans. He noticed the jeans were wet at the hem along the bottom of each leg, which led him to believe they had recently been worn outside in the snow. He then removed the' jeans from the backpack. Underneath the jeans, Officer Smithey saw a black handgun.
After removing the jeans and locating, the handgun, Officer Smithey stopped removing items from the backpack. He opened the wallet he had placed on the chair a few moments before and saw that it contained identification belonging to Marvis Jackson. Officer Smithey took a photograph of the handgun inside the backpack to use in an application for a search warrant. He then emerged from the bedroom and informed the sergeant who was the supervising officer on the scene it was time to lock down the apartment. The officers conducted a protective sweep of the apartment and transported Olson, Turner, and Miller to the station for questioning.
Back at the station, Officer Smithey completed a statement in support of an application-for a search warrant. Detectives spoke with Miller, Turner, Olson, and Jackson in a series of interviews conducted between approximately 2:49 a.m. and 6:00 a.m. Turner admitted to committing the armed.robbery of the restaurant, and Olson admitted to cutting up a t-shirt to provide Turner and Jackson with the strips of fabric they used to cover their faces during the robbery. After being informed the police had obtained confessions from Turner and Olson' and retrieved a gun and cash from the apartment, Jackson also confessed to committing the restaurant robbery.
In the morning, the detective investigating the’ gas station robbery conducted a second round of interviews beginning after 7:00’ a.m. During those intérviews, the detective showed Turner and Miller photographs of the gas station robber captured by a security camera. Both Turner and Miller indicated the gas station robber looked like Jackson and recognized the shoes the robber was wearing. Turner also indicated Jackson had told him he had robbed a gas station, and Miller recognized the cap the robber was wearing and told the detective where it could be found in the apartment. When the detective subsequently interviewed Jackson, he confessed to committing the gas station robbery. -
During the interviews conducted throughout the night and in the morning, Miller, Turner, and Jackson all confirmed Jaékson had been staying at the apartment for week's prior to December 31 and acknowledged hé had personal belongings in the apartment. When the police executed the search warrant on the apartment in the morning, they recovered $129 in one-dollar bills, $45 in five-dollar bills, and pieces of the t-shirt described by the men during their ■ interviews the night before. The police also recovered a black Yankees cap matching the one' worn by the gas station robber.
II. Prior Proceedings.
The State charged Jackson with two counts of robbery in the second degree, including one count for the restaurant robbery and one count for the gas station robbery. See Iowa Code section 711.3 *428 (2011). Jackson pled not guilty on both counts and filed a motion to suppress all evidence obtained as a result of the search of his backpack. In his motion to suppress, Jackson argued the warrantless search of his backpack was unreasonable and violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution and article I, section 8 of the Iowa Constitution because Olson had neither actual authority nor apparent authority to, consent to. the search of his backpack. Jackson further asserted the officers had a duty to inquire as to the ownership of the backpack before searching it because they had encountered an ambiguous situation that gave them reason to doubt whether Olson had authority to consent to a search of the backpack. The State resisted the motion.
Following a hearing, the district court denied the motion to suppress, Jackson thereafter waived his right to a jury trial and stipulated to a trial on the minutes of testimony. The district court found Jackson guilty of both counts of second-degree robbery and sentenced him to two concurrent indeterminate terms of incarceration not to exceed ten years with a mandatory minimum sentence of seven years of incarceration.
Jackson appealed, and we transferred the case to the court of appeals. The court of appeals concluded Olson had apparent authority, but not actual authority, to consent to the search of the backpack. The court of appeals allowed Jackson to pursue his ineffective-assistance-of-counsel claim in a postconviction relief proceeding because it determined his trial counsel had not preserved his argument that the Iowa Constitution requires consent from a person with actual authority to authorize a warrantless search.
Jackson filed an application for further review, which we granted.
III. Issues.
Jackson claims Officer Smithey violated his fights under the Fourth Amendment of the United States Constitution because Olson had neither actual authority nor apparent authority to consent to the search of his backpack. Alternatively, Jackson claims Officer Smithey violated his rights under article I, section 8 of the Iowa Constitution because Olson did not have actual authority to consent to the search of his backpack. Finally, Jackson claims that if the search did not violate the federal constitution, his trial counsel was constitutionally ineffective for failing to argue a different standard determines the constitutionality of warrantless' searches authorized by consent under the state constitution.
IV. Standard of Réviéw.
Jackson raises constitutional issues in this appeal. We review constitutional issues de novo. State v. Kooima, .833 N.W.2d 202,205 (Iowa 2013).
V. The Federal Doctrine of Consent by Apparent Authority.
The Fourth Amendmeiit of'the'United States Constitution provides,
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV.
A warrantless search violates the Fourth Amendment unless a warrant was not required to authorize it. See State v. Nitcher, 720 N.W.2d 547, 554 (Iowa 2006). *429 The State bears the burden of proving by a preponderance of the evidence that a warrant was not needed to authorize a warrantless search. See id. In determining whether the State has met this burden, we use an objective standard to assess the conduct of the officer who performed the search. Id.
Under the Fourth Amendment, a warrant is not required to authorize a search performed pursuant to voluntary consent. State v. Pals, 805 N.W.2d 767, 777-82 (Iowa 2011).[2] An officer may rely on third-party consent to authorize a war-rantless search so long as the circumstances indicate the third party had actual authority to consent to a search of the location searched. See, e.g., State v. Campbell, 826 N.W.2d 350, 352 (Iowa 1982); State v. Folkens, 281 N.W.2d 1; 3-4 (Iowa 1979). To establish a third party had actual authority to consent to a search, the government may show the. third party “possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.” Campbell, 326 N.W.2d at 352 (quoting United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974)). Common authority to consent to a search derives from “mutual use of the property by persons generally having joint access or control for most purposes.” Matlock, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, 39 L.Ed.2d at 250 n. 7; see State v, Bakker, 262 N.W.2d 538, 546 (Iowa 1978).
Under the Fourth Amendment, an officer may also rely on third-party consent to authorize a warrantless search based on the third party’s apparent authority to consent to the search. State v. Lowe, 812 N.W.2d 554, 576 (Iowa 2012). The doctrine of consent by apparent authority allows the government to demonstrate an officer who conducted a war-rantless search was authorized to do so because the officer “reasonably (though erroneously)” relied on the apparent authority of the person who consented to the search. Id. (quoting Illinois v. Rodriguez, 497 U.S. 177, 186, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148, 160 (1990)).
The State relies on the doctrine of consent by apparent authority to justify the officer’s warrantless search of the backpack found in the bedroom. The doctrine has its genesis in .the United States Supreme Court’s decision in Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148. In that case, an assault victim accompanied police officers to the defendant’s apartment^ unlocked the door with a key she had, and let the officers into the apartment. Id. at 179-80, 110 S.Ct. at 2796-97, 111 L.Ed.2d at 155-56. The officers did not have an arrest warrant for the defendant or a search warrant to search the apartment. Id. at 180, 110 S.Ct. at 2797, 111 L.Ed.2d at 155-56. As the officers moved through the premises, they observed drug paraphernalia and containers filled with white powder later determined to be cocaine in plant view in the living room. Id. at 180, 110 S.Ct. at 2797, 111 L.Ed.2d at 156. ■ They found additional containers filled with cocaine in two open attache cases in the bedroom.' Id. After the officers arrested the defendant on drug charges,' he moved to suppress the evidence seized at the time of his arrest on the ground that , the victim no longer lived in the apartment' and therefore had no authority to consent to the entry and the search. Id.
*430 The Supreme Court determined the State failed to prove the victim had common authority over the premises to consent to the search. Id. at 181-82, 110 S.Ct. at 2797-98, 111 L.Ed.2d at 156-57. This was not, however, the end of the Court’s inquiry. The Court stated the question of whether the officers violated the Fourth Amendment turned on an objective factual determination as to whether the officers reasonably believed the woman had authority to consent to the entry. See id. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. The Court thus concluded a war-rantless search conducted pursuant to consent by a third party does not violate the Fourth Amendment so long as the facts available to the officers at the moment it occurred would “ ‘warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.” Id. at 188-89,110 S.Ct. at 2801, 111 L.Ed.2d at 161 (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d '889, ,906 (1968)). “If not,” the Court explained, “then warrantless entry without further inquiry is unlawful unless authority actually exists.” Id.
In concluding searches conducted pursuant to consent by apparent authority satisfy the Fourth Amendment, the Court reasoned the Fourth Amendment requires law enforcement to make reasonable, not perfect, factual determinations concerning the scope of authority possessed by a person who consents to a search:
It is apparent that in order to satisfy the “reasonableness” requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable....
We see no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search. Whether the basis for such authority exists is, the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably. The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because .they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.
Id. at 185-86, 110 S.Ct. at 2800, 111 L.Ed.2d at 159-60.
However, the Court cautioned that apparent authority does not necessarily exist merely because a person explicitly asserts a factual basis suggesting he or she has authority to consent. Id. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. Rather, a person could make such an assertion and “the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry,” in which case “warrantless entry without further inquiry” would be unlawful unless the consenting party had actual authority. Id. at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. Thus, the Court emphasized courts must use an objective standard to determine whether apparent authority exists. Id. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. In addition, the Court acknowledged the government bears the burden of establishing the effectiveness of third-party consent. Id. at 181, 110 S.Ct. at 2797, 111 L.Ed.2d at 156. The Court remanded the case for a determination as to whether the officers reasonably relied on apparent au *431 thority to authorize their entry into the apartment because the appellate court had not determined whether officers had reasonably believed the victim had authority to consent. Id. at 189, 110 S.Ct. at 2801, 111 L.Ed.2d at 161.
Rodríguez involved a circumstance in which officers discovered evidence in plain view after they entered a home without a warrant based on consent given by a person who lacked actual authority to consent to a search of the home. In contrast, this case requires us to consider how. the doctrine of consent by apparent authority applies to a closed container found inside a home searched by officers relying on consent given by a person who had actual authority to consent to the search of the home but lacked actual authority to consent to a search of the container. The Supreme Court has yet to apply the doctrine of consent by apparent authority to a closed container found within a home under these circumstances. Nor is there agreement among the federal circuit courts of appeals concerning how the apparent-authority doctrine applies under such circumstances. See, e.g., United States v. Taylor, 600 F.3d 678, 686 (6th Cir.2010); United States v. Snype, 441 F.3d 119, 136-37 (2d Cir.2006); United States v. Waller, 426 F.3d 838, 847-49 (6th Cir.2005); United States v. Melgar, 227 F.3d 1038, 1041-42 (7th Cir.2000); United States v. Salinas-Cano, 969 F.2d 861, 865-66 (10th Cir.1992).
A. Circuits Concluding Officers Have a Duty to Inquire Before Searching a Closed Container if a Reasonable Officer Would Conclude the Authority of the Person Who Consented to. a Premises Search is Ambiguous. The Tenth Circuit applied the apparent-authority doctrine in the context of a closed-container search in United States v. Salinas-Cano. After -officers arrested the defendant following a drug buy, they asked his girlfriend for permission, to search her apartment and indicated they were specifically interested in the defendant’s possessions. Salinas-Cano, 959 F.2d at 862. She consented and led the officers to the area of the apartment where the defendant kept his belongings. Id. The officers opened a closed suitcase belonging to the defendant and found cocaine inside. Id. The district court denied the defendant’s motion to suppress the evidence, and the defendant appealed. Id. at 863.
The Tenth Circuit reversed, emphasizing the government bears the burden of proving the effectiveness of third-party consent. Id. at 862, 864. The court concluded the government cannot meet this burden when officers faced with an ambiguous situation concerning the authority of the consenting party proceed to search without making further inquiry. Id. at 864. The court deterrhined a warrantless search is unlawful without further inquiry “if the circumstances make it unclear whether the property about to be searched is subject to ‘mutual use’ by the person giving consent.” See id., (quoting United States v. Whitfield, 939 F.2d 1071, 1075 (D.C.Cir.1991)), The court reasoned that under Rodriguez, apparent authority exists only in “situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be.” .Id. at 865 (quoting Whitfield, 939 F.2d at 1074). The court therefore concluded the officer’s subjective belief that the girlfriend had .authority to consent to a search of the suitcase was insufficient to legitimize the search under the apparent-authority, doctrine. id. at 866.
It is not enough for the officer to testify, as he did here, that he thought the consenting party had joint access and control. The “apparent authority” doctrine does not empower the police to *432 legitimize a search merely by the incantation of the phrase.
Id. at 865 (citation omitted).
Based on Rodriguez, the Tenth Circuit concluded proper analysis of apparent authority “rests entirely on the reasonableness of 'the officer’s belief’ that the consenting party had common authority over the container searched. See id. The officers had not asked any question that would have permitted them to determine whether the defendant’s girlfriend had mutual use of his suitcase and authority to consent to a search of it. Id. at 866. Therefore, because the information known to the officers was insufficient to support a reasonable belief that the girlfriend- had actual authority to consent to a search of the defendant’s suitcase, the court concluded she did not have apparent authority to consent to the search. See id. According to the court, “To hold that an officer may reasonably find authority to consent solely on the basis of the presence of a suitcase in the home of another would render meaningless the Fourth Amendment’s protection of such suitcases.” Id.
The Tenth Circuit 'subsequently confirmed officers have a “duty to investigate” when it is ambiguous whether the person who consents to" a- premises search has authority over the location to be searched before conducting a warrantless search of a closed container:
Importantly, “where an officer is presented with ambiguous facts related to authority, he or she has a duty to 'investigate further before relying on the consent.” -Thus, the government cannot meet its burden of demonstrating a third party’s apparent authority “if agents, faced with an ambiguous situation, nevertheless., proceed without making further inquiry.”-
United States v. Cos, 498 F.3d 1115, 1128 (10th Cir.2007) (citations omitted) (quoting United States v. Kimoana; 383 F.3d 1215, 1222 (10th Cir.2004)).
The Sixth Circuit Court of Appeals analyzed whether a' third party had apparent authority to cohsent to a search of a closed container in a similar manner in United States v. Waller. In Waller, officers arrested the defendant in the parking lot of an- apartment complex where- his friend was a tenant. 426 F.3d at 842. After the officers secured the defendant and proceeded to the apartment, the tenant told them the defendant had been storing some property there. Id. The tenant consented to a search'of the apartment. Id. During the search, the officers opened a closed luggage bag they found in a bedroom closet and discovered a firearm. Id. The officers asked the tenant and his girlfriend whether the luggage bag or the firearm belonged to either of them. Id. Both individuals denied ownership of both the bag and the firearm. Id. The defendant appealed his conviction for being a felon in possession of a firearm.- Id. at 843. He argued the district court erred in denying his motion to suppress the firearm evidence by ruling the officers had actual or apparent authority to search the luggage bag. Id.
After determining the tenant lacked common authority over the luggage bag, the Sixth Circuit considered whether the tenant had apparent authority to consent to the search of the bag. Id. at 844-46. The court summarized the doctrine of consent by apparent ^authority established in Rodriguez as follows:
“When one person consents to a search of property owned by another, the consent is valid if ‘the facts available to the officer at the moment •... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.’ ” Whether the facts presented at the time of the search *433 would “warrant ■ a man of reasonable caution” to believe the third party has common authority over the property depends upon all of the surrounding circumstances. The government' cannot establish that its agents reasonably relied upon a third party’s apparent authority “if agents, faced with an ambiguous situation,- nevertheless proceed without making further inquiry. If the agents do not learn' enough, if the circumstances make it unclear whether the property about to be searched is subject to ‘mutual use’ by- the. person giving consent, ‘then warrantless entry is unlawful without further inquiry.’ ” Where the circumstances presented would cause a person of reasonable caution to question whether' the third party has mutual use of the property, “warrant-less entry without further inquiry is unlawful!;.]”
Id. at 846 (alteration in original) (citations omitted) (first quoting IMited States v. Jenkins, 92 F.3d 430, 436 (6th Cir.1996); then quoting Rodriguez, 497 U.S. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161; then quoting United States v. McCoy, Nos. 97-6486, 97-6486, 97-6488, 1999 WL 357749, at *10 (6th Cir. May 12, 1999); and then quoting Rodriguez, 497 U.S. at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161). The court thus concluded the search of the bag was unlawful because under the circumstances it was unclear to the officers whether the tenant had common authority over it. Id. at 847, 849. Based on the facts known to the officers, the court concluded a reasonable officer would have found ambiguity existed with respect to the ownership of the bag and thus with respect to the question of common authority. Id. at 849. • <
In arriving at this conclusion, the Sixth Circuit reasoned that' in the context of a closed container, the existence of common authority to consent derives from “mutual use of - the property by persons generally havifig joint access or control for most purposes.” Id. at 845, 848-49 (quoting Matlock, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, 39 L.Ed.2d at 250 n. 7). Thus, the court emphasized that although officers might have believed the tenant had some level of control over the bag, in light of what the government would have had to prove to éstablish the tenant had common authority to consent to a search of it, a reasonable officer would have been “on notice of his obligation to make further inquiry prior to conducting a search.” Id. at 848-49. In . concluding the ‘ circumstances were sufficiently ambiguous to place a reasonable officer on notice that the tenant might, not have had authority to consent to the search, the court found both the context of the search and its purpose to be releyant:
The facts in this case are clear: the police never expressed an interest in [the tenant’s] belongings- in [the tenant’s] apartment. The very purpose of the police presence was to search for (presumably) illegal possessions of:[the defendant’s]. . Why - would the police open the suitcase if they reasonably believed it belonged to [the tenant]? The answer is that they would not. have opened the bag. They opened the bag precisely because they believed it likely belonged to [the defendant]. The police knew [the defendant] was ■ storing belongings at the-[tenant’s] -apartment. Most people do not keep a packed, closed suitcase in their own: apartment. Deliberate ignorance of conclusive ownership of the suitcase does not excuse the warrantless search of the suitcase, especially when actual ownership could easily have been confirmed.
Id. at 849 (emphasis omitted).
The Sixth Circuit concluded the district court erred in denying the defendant’s *434 motion to suppress and reversed his conviction. See id. It did so because the officers failed to make inquiry before searching the bag despite being on notice the tenant might not have had authority to consent to a search of it. Id. at 848-49. The court thus concluded an officer has a duty to inquire before relying on consent in circumstances in which the authority of the consenting person is ambiguous. Id. at 846-47. The court stressed its conclusion was consistent with the Supreme Court’s decision in Rodriguez and decisions by other courts to consider such circumstances. Id. (citing cases).
The Sixth Circuit revisited this issue in United States v. Taylor. There, officers arrested the male defendant in the apartment of his childless female friend. Taylor,.'600 F.3d at 679, 682. The officers then asked the defendant’s friend for permission to search her apartment, which she granted. Id. at 679. When the officers conducted the search, they found a closed shoebox for a pair of men’s basketball shoes partially covered by men’s clothes in the closet of a spare bedroom containing men’s clothes, children’s clothes, and children’s toys. Id. Though the defendant’s friend lived alone in the apartment, the officers made no inquiry to determine whether she had authority to consent to a search of the closed shoebox before opening it. Id. Inside the shoebox, they found a handgun and ammunition belonging to the defendant. Id. at 680. The government charged the defendant with being a felon in possession of a firearm and ammunition. Id. The district court granted the defendant’s motion to suppress the evidence, finding the defendant’s friend had neither common authority nor apparent authority to consent to the search of the shoebox. Id.
The Sixth Circuit affirmed the district court decision granting the defendant’s motion to suppress. Id. at 679. In doing so, the court acknowledged the officers might have begun the search with a reasonable belief that everything in the apartment was subject to mutual use by its sole tenant. Id. at 681. But the court concluded “a reasonable person would have had substantial doubts about whether the box was subject to mutual use” by the tenant based on both the location where it was found and the label indicating it was for a pair of men’s shoes. Id. at 682. The court stated its conclusion was reinforced by the fact the district court found the officers likely would not have opened the shoebox if they had believed it belonged to the tenant, rather than the defendant. Id.
B. Circuits Concluding the Defendant Bears the Burden of Demonstrating Officers Had Reason to Question the Authority of the Person Who Consented to a Premises Search. The Seventh Circuit considered apparent authority in the context of a closed-container search in United States v. Melgar. In Melgar, officers investigating the passing of counterfeit checks obtained consent to search a motel room from the woman who had rented it. 227 F.3d at 1039-41. While conducting a search of the room, the officers found a purse with no identifying marks under the mattress of one of the beds. Id. at 1040. Though the officers knew several other women were staying in the room, they opened the purse without asking any questions to determine whether it belonged to the woman who rented the room. See id. at 1039-40. Inside, they discovered counterfeit checks and a fake identification bearing a photograph of the defendant, who was also staying in the room but had not consented to the search. Id. at 1040. The defendant challenged the district court’s denial of her motion to suppress the evidence found inside the purse. Id.
*435 The Seventh Circuit concluded that because the police had no reason to know the woman who consented to the search of the room could not consent to a search of the purse, the district court correctly denied the defendant’s motion to suppress. Id. at 1041. The court rejected the defendant’s argument the officers should have inquired as to the owner of the purse because they had matched the other purses in the room to the other women staying there. Id. at 1040-41.
The Seventh Circuit acknowledged the lack of binding authority concerning the proper application of the apparent-authority doctrine to- closed-container searches. See ' id. at 1041. However, the court framed the question presented as follows:
In a sense, the real question for closed container searches is which way the- risk-of uncertainty should run. Is such a search permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented to the search ..., or is it permissible if the police do not have reliable information that the container is not under the authorized control.

Id.

In concluding the district court correctly denied the defendant’s motion to suppress, the Seventh Circuit invoked the general rule that consent to search a space generally extends to. a container within it so long as “a reasonable officer would construe the consent to extend to the container” and precedents governing the searches of containers found in automobiles. Id. at 1041-42. The court thus concluded apparent-authority exists ,so. long as the.officer .who conducts a warrantless search pursuant to third-party consent has no reliable information indicating the consenting party has no control over the container being searched. See id. .In other words, the court, concluded an officer may reasonably construe a third party’s consent to search a premises to extend to all closed containers within that premises unless the officer has “reliable information” indicating a particular container is not within the third party’s control.[3] See id. at 1041.
The' Second Circuit came to a similar conclusion in United States v. Snype. In that case, officers ‘discovered the defendant on the floor in the bedroom of an apartment belonging to his friend’s girlfriend. Snype, 441 F.3d at 126-27. After the officers arrested the defendant and removed him from the apartment, they obtained the girlfriend’s consent to search it. Id. at 127. During the search, the officers opened a closed knapsack and a closed red plastic bag they found on the floor in the room from which they had just *436 removed the defendant. Id, The knapsack and the bag were sitting next to an open teller’s box filled with cash taken from the bank the defendant was accused of'robbing. Id. The defendant appealed his conviction for conspiracy to commit bank robbery, arguing the district court improperly admitted the evidence -found in -the knapsack and the bag. Id. at 125, 136.
Thé Second Circuit concluded the district court properly determined the voluntary consent of the host had authorized the warrantless search of the entire apartment and all items within it, including the knapsack and the bag belonging to the defendant. Id. at 137. The court dismissed as conclusory the defendant’s argument that the officers “had no objectively reasonable basis for concluding” the tenant had any interest in the closed containers found beside him. See id, at 136-37. Although the court acknowledged the host’s open-ended consent could not authorize a search or seizure of items found within the apartment that “obviously belonged exclusively” to another person, it found .the district court did not err in admitting the evidence found inside the knapsack and the red plastic bag. Id, at 137. Rather* the court concluded the search did not violate the Fourth Amendment because the defendant failed to adduce credible evidence demonstrating the knapsack and the bag “so obviously belonged exclusively to him that the officers could not reasonably rely” on the host’s unrestricted consent to search the premises. See id. at 136-37.
C. Determination of the Applicable Test. Under Rodriguez, a warrant-less search of a closed container conducted pursuant to consent by a third; party does not violate the Fourth Amendment so long as the person who consented had actual or apparent authority to consent to the search. See Rodriguez, 497 U.S. at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161 (quoting Terry, 392 U.S. at 21-22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906). The dispute among the federal circuit courts of appeals concerns the question of who bears the burden of proving third-party consent did or did not authorize a container search when the third party had actual authority to consent to a search of a premises but lacked actual authority to consent to a search of a container- on that premises. The Sixth arid Tenth Circuits have concluded the government bears the burden of demonstrating the officer inquired before searching a closed container if the circumstances would have alerted a reasonable officer that the person who consented to a search of the premises might not have had authority to consent to a search of a closed container. See Taylor, 600 F.3d at 681; Salinas-Cano, 959 F.2d at 864. The Second- and Seventh Circuits have concluded the defendant bears the burden of adducing evidence to show the officer could not have reasonably relied on tjiird-party- consent so long as the third party had authority to consent to a search of the premises. See Snype, 441 F.3d at 136-37; Melgar, 227 F.3d at 1041. For the following reasons, we find- the reasoning of the Sixth and Tenth Circuits to be more persuasive than the reasoning of the Second and Seventh Circuits.
■ First, we recognize a privacy interest in a closed container is not necessarily coextensive with a privacy interest in the surrounding location in which the. container is located:
A privacy interest in a home itself need not be coextensive with a privacy interest in the contents or movements of everything situated insidé the home. This has been recognized before in connection with third-party consent to searches. A homeowner’s consent to a search of the home may not be effective consent to a search of a closed object *437 inside the home. Consent to search a container or a place is effective only when given by one with “common authority over or other sufficient relationship to the premises or effects sought to be inspected.” • .
United States v. Karo, 468 U.S. 705, 725, 104 act 3296, 3308, 82 L.Ed.2d 530, 548 (1984) (O’Connor, J., concurring) (quoting Matlock, 415 U.S. at 171, 94 S.Ct. at 993, 39 L.Ed.2d at 250).- As the . Indiana Supreme Court has pointed out, the Melgar court did not acknowledge third-party consent to search a premises may implicate privacy interests in a closed container that are distinct from those the third parly .had in the premises. See Krise v. State, 746 N.E.2d.957, 967-68 (Ind.2001). We reject the notion that a guest assumes the risk the government might unreasonably intrude upon a privacy interest in a closed container merely by bringing the container into the home of another person. See id. As the United States Supreme Court has noted, “what is at issue when a claim of apparent consent is raised is hot whether the right to be free of searches has been waived, but whether the right to be free of unreasonable searches has been violated.” Rodriguez, 497 U.S. at 187, 110 S.Ct. at 2801, 111 L.Ed.2d at 161.
Second, both the Supreme Court and this court have recognized the home is entitled to special status in the. Fourth Amendment context. See Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 2041, 150 L.Ed.2d 94, 100 (2001); State v, Ochoa, 792 N.W.2d 260, 276-77, 287 (Iowa 2010). It does not square with the Fourth Amendment’s recognition of the sanctity of the home to suggest bringing an object into a home might diminish, rather than enhance, a person’s privacy interest in that object. See Karo, 468 U.S, at 717, 104 S.Ct. at 3304, 82 L.Ed.2d at 542 (holding warrantless electronic monitoring of a beeper inside a 'drum brought inside a home violated'the Fourth Amendment).
Third, when a defendant moves to suppress evidence obtained when an officer conducted a warrantless search, the State bears the burden of proving the search did not violate the Fourth Amendment. Nitcher, 720 N.W.2d at 554; The Supreme Court has indicated this burden rémains. ■’With the government in the context of third-party consent. Rodriguez, 497 U.S. at 181; 110 S.Ct. at 2797, 111 L.Ed.2d at 156. Rodriguez made clear the government may meet its burden of proving the effectiveness of third-party consent by two possible means. Id. at 181, 188-89, 110 S.Ct. at 2798, 2801; 111 L.Ed.2d at 156, 161. First, the government may demonstrate the person consenting to the search had actual authority to consent to a search of the location searched; Id. at 181, 110 S.Ct. at 2798, 111 L.Ed.2d at 156. Second, the government may demonstrate the facts available to the officer when the officer conducted the search would have warranted a person of reasonable caution in the belief that the person consenting had authority to consent to a search of the location searched, .Id. at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at ,161. .It would improperly reverse the burden of .proof to require a defendant to disprove the effectiveness of the consent relied upon by officers who searched a closed container belonging to the defendant.
■ Finally, to flip the presumption of unreasonableness that generally applies to war-rantless searches merely because a third party explicitly granted consent to-a premises search would be inconsistent ■ with Rodriguez. As the Supreme Court recognized in Rodriguez, even when a person makes an assertion he or she has authority to authorize a search, “the surrounding circumstances could conceivably be such that a reasonable person would doubt'its *438 truth and not act upon it without further inquiry.” Id, at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161.
The lesson of Rodriguez is that a warrantless search is not authorized when the circumstances would cause a reasonable officer to doubt whether the party consenting had authority to consent with respect to the location to be searched. The mere fact that an officer subjectively relied on third-party consent does not render that reliance reasonable. See id. at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. Reliance on apparent authority to authorize a search is only reasonable when the authority of the person consenting is actually apparent with respect to the location to be searched. Thus, when the totality of the circumstances indicates a reasonable officer would have conducted further inquiry to determine whether the person who consented to a premises search had authority to consent to a search of a closed container, the government must demonstrate the officer did just that in order to establish the search of the container was reasonable.
The government bears the burden of proving a warrantless search was reasonable; Therefore, in determining whether a warrantless search of a container was reasonable based on the apparent authority of the consenting party, the relevant question is not whether the defendant has adduced enough evidence to prove an officer’s reliance on third-party consent was unreasonable.[4] Rather, the question is whether the government has proved by a preponderance of the evidence that circumstances existing when the container was searched would have warranted a person of reasonable caution in the belief that the person who consented to a search of the premises also had authority over the container. Waller, 426 F.3d at 846 (quoting Rodriguez, 497 U.S. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161).
The government cannot demonstrate an officer reasonably relied on apparent authority to authorize a search if the officer proceeded without making further inquiry when faced with an ambiguity concerning the question of whether the container to be searched was subject to ownership or mutual use by the consenting party. See id. at 846-47. When an officer faced with such ambiguity searches a closed container without a warrant and without inquiring enough to clarify whether the person who consented to a premises search had authority to consent to a search of the container, the search is unlawful. See Rodriguez, 497 U.S. at 188-89,110 S.Ct. at 2801, 111 L.Ed.2d at 161; Waller, 426 F.3d at 846.
D. Analysis. As the district court noted, the State presented no evidence to indicate Olson had actual authority to consent to a search of Jackson’s backpack. In addition, the State conceded Jackson maintained control over his backpack as a guest in Olson’s bedroom. Thus, we must determine whether Olson had apparent authority to consent to the search of Jackson’s backpack.
The first step in our analysis is to determine whether the State proved by a preponderance of the evidence the facts and circumstances known to the officers when Jackson’s backpack was searched would have warranted a person of reasonable *439 caution in the belief that Olson had authority over the backpack. If so, Officer Smi-they reasonably relied on apparent authority to authorize the warrantless .search without making further inquiry. To answer this question, .we, must consider whether a reasonable officer would have found Olson’s authority to consent to a search of the backpack ambiguous based on the facts and circumstances known to the officers. See Waller,- 426 F.3d at 847.
The evidence shows the officers knew the following facts when Officer Smithey conducted the search of the closed backpack. The officers initiated contact with the occupants of the ■ apartment because they saw a black male observing them from the window and suspected he was involved in the robbery. The officers had just responded to a call about a robbery allegedly committed by two black males and followed footprints in the snow to the building in which the apartment was located. They were not responding to a call originating inside the apartment. When the officers knocked on the front door, it was nearly 1:00 a.m. After Turner answered the door and let the officers inside, Turner and Miller told the officers they lived in the apartment with their roommate, Olson.
Turner and Miller indicated Olson was the only other person present in the apartment, but that turned out to be untrue. When Officer Smithey asked Olson if he could peek inside his bedroom, Olson acknowledged Jackson was asleep .in his bed. Olson told the officers Jackson was not in the apartment when he went to sleep and he awoke to discover Jackson sleeping beside him, but he did not suggest he was alarmed to discover Jackson in his bed. No one suggested to the officers that Jackson had broken into the apartment or had recently arrived, and no one indicated anything suspicious had occurred that evening. Rather, Turner indicated he had been home, since approximately 9:00 p.m. and nothing suspicious had occurred since that time. The officers did not ask Turner, Miller,, or Olson if Jackson was staying in the apartment or if he had any belongings there. Although the officers noticed Jackson was sweaty and difficult to rouse from slumber, they found him to. be cooperative once he was awake..
Before Officer Smithey informed Jackson of the outstanding warrant for his arrest and escorted him from the room, the officers did not ask him if he was staying in the apartment or had any belongings there. When the officers later asked Olson if there were any guns in his bedroom, he responded that there should not be or there were not any that he knew of. Olson then consented to a search of the room for guns or evidence of the robbery, but neither officer asked whether he owned the backpack or confirmed that everything in.the room belonged to him. The backpack was sitting a'few feet from the bed: where Jackson- had just been sleeping along the wall next to or partly inside the closet door, which was partially off its hinges.
We conclude the circumstances existing when Officer Smithey conducted the search of the backpack would- cause a person of reasonable; caution to question whether the backpack belonged to Jackson or Olson and whether it was subject to mutual use by. Olson. See id. at 849. First, although no one in the apartment referred to Jackson as an overnight guest, the circumstances clearly suggested Jackson was an overnight guest. When the officers arrived at the apartment in the middle of the night, Jackson appeared . to be asleep in a bed. Olson stated he was not sure when Jackson arrived, but he-was not alarmed when he awoke to discover Jackson partially clothed beside him in *440 bed. Obviously Olson and Jackson were familiar enough that Jackson’s presence in Olson’s room late at night was not an unusual occurrence. In fact, there was reason to believe Jackson had a key to the apartment because Turner and Miller did not appear to know Jackson was in the apartment and Olson indicated Jackson arrived when he was asleep. In other words, the information available to the officers suggested Jackson arrived at. the apartment when no one was home sometime after Olson went to sleep but before Turner arrived home from work.
Second, the circumstances known to the officers were sufficient to alert them to the fact that Jackson had clothes other than the pajama pants he was wearing- at the apartment. The officers knew it was cold enough outside that Jackson probably had some sbrt of warmer apparel at the apartment, as there was fresh snow on the ground and they had followed footprints in the snow to the apartment- building. The floor plan of the apartment was such that Jackson would- have had to enter it from outdoors. ’ ' ‘ ■•■ - -
Third, the circumstances indicated it was likely the clothes Jackson was wearing when he arrived at the apartment were in Olson’s bedroom. Jackson was asleep on the bed in Olson’s bedroom wearing pajama pants when the officers arrived. Yet the statements Turner and Miller made to the'Officers indicated they did not know Jackson was in the apartment. Had Jackson changed into the pajama pants in the bathroom, kitchen, or living room and left his clothes there, Turner and Miller likely would have seen them and known Jackson was in the apartment. Thus, the fact that Turner and Miller did not know Jackson was in- the apartment suggested he either changed, into the pajama pants in Olson’s room or moved his clothes to Olson’s room after putting the pajama pants on. Moreover; a backpack is the sort of container a person staying overnight in a place other than his or her home might use to hold clothing and' other personal items.
Fourth, the-statements Olson made suggested he knew there were items in his bedroom that did not belong to him. Olson did not answer definitively when asked whether there was a gun in the room. Had everything in the room that' could conceal a gun belonged to Olson, he could have stated with certainty that there was no gun in the. .room. Instead, Olson waffled. His uncertainty in response to a direct question suggested he knew there were items in the room that did not belong to him and knew that one of those items might be a container concealing a gun from plain view.
Faced with these circumstances, we conclude a reasonable officer would have doubted whether Jackson owned the backpack and questioned whether Olson had authority to consent to a search of it. See id. at'848. The State does not dispute the officers made no inquiry concerning who owned the backpack before Officer Smithey searched it. Nor does the State suggest either officer ever asked anyone whether Jackson was staying in the apartment or had any personal belongings there. Had the officers asked questions intended to-clarify whether Olson had authority to consent to the search of the backpack, Officer Smithey might have reasonably relied on the answers the officers received to proceed with -a warrantless search based on Olson’s apparent authority to consent. However, the officers asked no questions to clarify who owned or used the backpack before ’ Officer Smithey searched it even though the circumstances indicated Olson’s authority to consent to a search of the backpack was ambiguous. Because the officers asked no such questions, Officer Smithey’s-reliance on Olson’s *441 consent to a search of his room to authorize a warrantless search of the backpack was unreasonable. In short, because the circumstances were unclear and the officers sought no clarification, Officer Smi-they could not reasonably rely on apparent authority to authorize a warrantless search of the backpack.
The district court concluded the officers might have reasonably believed Jackson likely ran to the apartment after the robbery and feigned sleep. ' We do not disagree. However, the circumstances also suggested Jackson was either an overnight guest or staying in the apartment. The fact the officers might have reasonably thought one of these scenarios was more likely than the other does not eliminate the fact the circumstances were ambiguous. Moreover, if Officer Srftithey reasonably believed Jackson was one of the restaurant robbers when he searched the backpack, that suggests he did not reasonably believe Olson had authority over the 'backpack when he searched it. If the very, purpose of the search was to find evidence linking Jackson to the robbery, Officer Smithey would have had no motivation to open the closed backpack unless he believed it might have belonged to Jackson. See id. at 849.
Finally, wé note apparent authority is only a lawful basis for a search in “situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be.” Salinas-Cano, 959 F.2d at 865 (quoting Whitfield, 989 F.2d at 1074). Thus, even if Officer Smithey -reasonably believed Jackson had just arrived in the apartment, he could only- reasonably rely on apparent authority to justify the search of the backpack so long as he reasonably believed Olson owned it. ' In light of the facts known to the officers when Officer Smi-they opened the backpack, after realizing it contained a wallet and clothing recently worn outside, a reasonable officer would have been on notice that the backpack might not belong to Olson..
Nonetheless, when Officer Smithey removed the wallet from the backpack, he initially declined to open it. Instead, he reached into the backpack again, felt the wet hem on the jeans, and realized they had just been worn outside in the snow. At that point, if not before, a reasonable officer would have suspected the backpack likely belonged to- Jackson. However, instead of stopping the search, Officer Smi-they removed the jeans from the backpack and saw the gun beneath them. Only then did he open the wallet to confirm his suspicion that Jackson owned the backpack. The fact that he did so confirms he recognized it was unclear who owned the backpack by the time he removed the jeans from within it. Because Officer • Smithey could not ¡have, reasonably believed it was certain that Olson owned the backpack, yet declined to open the wallet sooner despite the ambiguous circumstances, his continued reliance on Olson’s consent to- authorize the warrantless search was unreasonable.
Because we conclude the circumstances were sufficiently ambiguous to place a reasonable officer on notice of his obligation to make inquiry as to who had authority to consent to a search, of the closed backpack prior to searching it, we conclude the war-rantless search of the backpack was unlawful under the Fourth Amendment. See Waller, 426 F.3d at 849. Thus, the district court erred in failing to suppress the evidence found in the backpack and the fruits of the unlawful search. See Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S.Ct. 407, 415-16, 9 L.Ed.2d 441, 453-54 (1963).
*442 VI. The Defendant’s Claim Under the Iowa Constitution.
Jackson also claims the State violated his rights under article I, section 8 of the Iowa Constitution. Article I, section 8 of the Iowa Constitution provides that “[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated.” Iowa Const, art. I, § 8.
We jealously guard our right to construe a provision of our state constitution differently than its federal counterpart, though the two provisions may contain nearly identical language and have the same general scope, import, and purpose. Kooima, 833 N.W.2d at 206; see Varnum v. Brien, 763 N.W.2d 862, 878 n. 6 (Iowa 2009). We also reserve our right to independently apply a federal standard more stringently than federal caselaw when construing the requirements of our state constitution, whether or not a party has advanced a different standard applies under the state constitution. Kooima, 833 N.W.2d at 206; see Varnum, 763 N.W.2d at 879 n. 6.
However, because we conclude the war-rantless search violated the federal constitution, we need not decide whether independent analysis or a more stringent application of the federal standard governing warrantless searches is required under our state constitution. See Ochoa, 792 N.W.2d at 267; cf. Racing Ass’n of Cent. Iowa v. Fitzgerald, 675 N.W.2d 1, 4-7 (Iowa 2004) (describing this court’s obligation to independently evaluate constitutionality under our state constitution when conduct does not violate the federal constitution). Thus, we do not consider whether a warrantless search is valid under our state constitution when the individual who consented to a search of a premises had apparent authority, but not actual authority, to consent to a search of a closed container on that premises. See, e.g., State v. Lopez, 78 Hawai'i 433, 896 P.2d 889, 903 (1995); State v. McLees, 298 Mont. 15, 994 P.2d 683, 690-91 (2000); State v. Wright, 119 N.M. 559, 893 P.2d 455, 460-61 (N.M.Ct.App.1995); State v. Will, 131 Or.App. 498, 885 P.2d 715, 719-20 (1994). Nor do we consider whether Jackson’s trial counsel was constitutionally ineffective for failing to argue the state constitution permits a war-rantless search of a closed container based on consent to a premises search only when the person who consented to the premises search had actual authority to consent to a search of the closed container.
VII. Disposition.
Because the State failed to prove Olson had apparent authority to consent to a search of Jackson’s backpack, we conclude the warrantless search was unlawful under the Fourth Amendment of the United States Constitution without further inquiry. Because the district court erred in denying Jackson’s motion to suppress the evidence found in the backpack and the fruits of the unlawful search, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.
All justices concur except APPEL, J., who concurs specially, and ZAGER, WATERMAN, and MANSFIELD, JJ., who dissent.

. The court issued the arrest warrant after the owner received a tip that a man named “Juicy” had robbed the gas station and the detective in charge of the investigation learned from multiple sources Jaclcson went by the nickname "Juicy Jackson.”

. We have not determined whether voluntary consent authorizes a warrantless search under article I, section 8 of the Iowa Constitution, or whether article I, section 8 .requires a knowing and intelligent waiver of rights to authorize a warrantless search. See Pals, 805 N.W.‘2d at 782.

. In cases decided both before and after Mel-gar, the Seventh Circuit expressly acknowledged officers have "a duty to inquire further as to a third party’s authority to consent to a search” before searching a closed container when "the surrounding circumstances make that person’s authority questionable.” United States v. Goins, 437 F.3d 644, 648 (7th Cir.2006); Montville v. Lewis, 87 F.3d 900, 903 (7th Cir.1996). Although the court has acknowledged "officers have a duty to inquire further as to a third party’s1 authority” in some circumstances, it emphasizes "that is only true when the circumstances make the authority questionable in the first place.” United States v. Pineda-Buenaventura, 622 F.3d 761, 777 (7th Cir.2010), To the extent these decisions seem inconsistent, that inconsistency may stem from the fact that the Mel-gar court concluded .ambiguity concerning the authority of a.third parly exists only when an officer has “reliable information” a container is not within the control of the person who consents to a search. See Melgar, 227 F.3d at 1041. It is hard to see how ambiguity concerning who has. authority over a container could exist only when an officer has "reliable information" concerning the answer to 'that very question.

. The defendant may prove it was unreasonable for an officer to rely on third-party consent by demonstrating the officer had reliable information indicating the consenting party lacked authority to consent to the search of a closed container or that it was obvious the container belonged exclusively to the defendant. Cf. Snype, 441 F.3d at 136-37; Melgar, 227 F.3d at 1041.